

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,051

## MANUEL VELEZ, Appellant

### v.

## THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 07-CR-721-G
### IN THE 404TH JUDICIAL DISTRICT COURT
### CAMERON COUNTY

JOHNSON, J., delivered the opinion of the Court in which PRICE, WOMACK, COCHRAN, and ALCALÁ, JJ., joined. KELLER, P.J., concurred. MEYERS, KEASLER, and HERVEY, JJ., dissented.

### O P I N I O N

In October 2008, a jury convicted appellant of the 2005 capital murder of a one-year-old child. TEX. PENAL CODE ANN. § 19.03(a)(8). Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art.

---

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

37.071, § 2(h). Appellant raises forty-six points of error on direct appeal. After reviewing appellant's points of error, we find his guilt phase points of error to be without merit. We sustain point of error five and reverse and remand this case for a new punishment hearing. We overrule all other punishment phase points of error.

## STATEMENT OF FACTS

On October 31, 2005, Angel Moreno ("Angel") was one day shy of his first birthday. He was in his home with his mother Acela Moreno ("Moreno"), his sister Emily, his brother Alexis, appellant's son Ismael, and appellant, who was romantically involved with Moreno. According to Moreno, after breakfast Angel cried as he lay in an armchair but he was otherwise behaving normally. Later that afternoon, Moreno placed Angel on a living-room sofa with Emily. Emily held Angel in her arms while Moreno took Alexis into the bedroom to sleep. When Moreno lay down with Alexis on one bed, appellant and Ismael arose from napping on another bed and left the bedroom. According to Moreno, although she was lying down, she never fell asleep. She did not hear anything unusual from the rest of the house for about twenty minutes, but she then heard "some blowing . . . three times" followed by running water in the bathroom.

From the bedroom door, appellant told Moreno that there was something wrong with Angel. Appellant had moved Angel from the living room to another bedroom. Moreno rushed to the child, and when she realized that Angel was not breathing, she directed appellant to use the neighbor's phone to call 9-1-1. Appellant left the house in search of a phone with Moreno following behind him. The neighbor later told police that appellant was yelling and agitated. In her statement to police, she described appellant as nervous to the point that he was not able to use the cordless telephone. However, at trial, she testified that appellant told her that the phone did not work and

described appellant as not as "worried as any person that would find themselves in this situation would be." She made the phone call to 9-1-1 for him. The same neighbor also told police that Moreno came out of the house holding Angel in her arms. In describing Moreno's demeanor to police, the neighbor said that Moreno "only would complain, she would say 'my baby, my baby' but I never really saw any tears." According to the neighbor, she could see Angel's heartbeat although his body was "completely lose (sic)" and "his lips were purple."

When Cameron County Deputy Constable Jesus Coria arrived at the scene, he saw a "lady carrying a baby with one of her hands." According to Coria, "the baby was just dangling" and "looked lifeless." He took Angel from Moreno and administered CPR until Emergency Medical Services (EMS) personnel arrived. He noted that appellant was standing with his arms crossed, just watching what was happening. At the direction of his supervising officer, Coria did not generate a report of the incident, but he testified at trial that he recalled noticing bruises on Angel's forehead, arms, and abdomen. He turned Angel's care over to firefighter and Emergency Medical Technician (EMT) Fernando Rivera, Jr., who also administered CPR. Rivera immediately noticed that Angel was not breathing. Rivera observed "several contusions on [Angel's] body, on the sides, on the back, on the head, [and] forehead."

En route to Valley Regional Hospital in Brownsville, Osiel Garcia, an EMT employed by the City of Brownsville EMS, administered an electrocardiogram, which showed electrical activity in Angel's heart, but no pulse. Garcia noted that Angel had suffered several visible injuries, including a contusion on the left side of his forehead with redness in the area, a scrape on his left ear, bruising on the trunk of his body, and discoloration of the skin in his lower extremities.

Angel's pediatrician, Dr. Asim Zamir, was called to the emergency room when Angel

arrived. Dr. Zamir noted that Angel was "critically ill" and that he was being given life-saving measures. He also noticed "marks and bruises on [Angel's] body which were unusual." According to Dr. Zamir, Angel's heart was not beating when he arrived at the hospital, but the medication administered during transport was beginning to take effect, and Angel's heart was beginning to beat. The decision was made to transport Angel to a larger hospital for "high level care."

Angel was transported by helicopter to Valley Baptist Hospital in Harlingen. Upon arrival, he was attended by pediatrician and intensive-care specialist Dr. Maria Camacho. According to Dr. Camacho, Angel was not responsive–his pupils were dilated, he had no involuntary gag reflex, and his heart had not been beating for at least 45 minutes. Dr. Camacho's examination also revealed that Angel suffered from anemia. He was pale, and it appeared that he had not been eating well. He suffered from frontal subarachnoid bleeding, multiple abrasions and bruises, and subdural hemorrhages. Dr. Camacho suspected that although Angel was "alive" because he was connected to a respirator, he was actually "brain dead." However, she could not make that diagnosis without following a protocol of exams that needed to be repeated twelve hours later by another physician. After twelve hours, pediatric neurologist Dr. Rafael Mimbela completed the same protocol and also concluded that Angel was "brain dead." Angel was disconnected from the respirator and declared dead. The autopsy revealed that Angel died as a result of significant head trauma.

## SUFFICIENCY OF THE EVIDENCE

In point of error seven, appellant challenges the sufficiency of the evidence supporting his conviction. When deciding whether evidence is legally sufficient to support a conviction, we assess all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*,

443 U.S. 307 (1979). In *Clayton v. State*, 235 S.W.3d 772 (Tex. Crim. App. 2007), we further described the *Jackson* standard of review with regard to cases involving circumstantial evidence and conflicting inferences:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Therefore, in analyzing legal sufficiency, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. Our review of all of the evidence includes evidence that was properly and improperly admitted. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. Direct and circumstantial evidence are treated equally: Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.

*Id*. at 778 (internal citations and quotation marks omitted).

To prove the essential elements of capital murder in this case, the state had to show that appellant intentionally or knowingly caused the death of a child who was under six years of age. TEX. PENAL CODE ANN. §§ 19.02(b)(1) & 19.03(a)(8). The identity of an offender can be proven by direct or circumstantial evidence. *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986). Additionally, circumstantial evidence may be used to prove intent. An accused's intent can be determined from his words, acts, and conduct. *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998). Evidence of a particularly brutal mechanism of death, inflicted upon a helpless victim, can prove intent or knowledge beyond a reasonable doubt. *Patrick v. State*, 906 S.W.2d 481, 487-88 (Tex. Crim. App. 1995).

In June or July of 2005, appellant and Moreno moved into a house on Chilton Street in

Brownsville, Texas, across the street from Moreno's sister Magnolia Medrano. Medrano testified that she noticed a bite mark on Angel during the time that Moreno and appellant were living together. Moreno, however, told Medrano that she was responsible for the bite mark. In September 2005, appellant went to work in Memphis, Tennessee. Moreno and her children moved in with Yvonne Salazar, a family friend, for a few weeks before appellant returned from Memphis. Angel's father, Juan Chavez, last saw Angel "when Hurricane Rita hit," which was in September 2005, while Moreno was living with Salazar and appellant was still in Memphis. Chavez testified that Angel was healthy and that he saw no signs of abuse. Medrano then saw Moreno and Angel on October 13, 2005, the day before appellant returned from Memphis. Medrano testified that on that day, Angel was fine and she did not see any injuries on the child.

On October 18, 2005, Moreno took Angel for a regular well-baby check with his pediatrician. Dr. Zamir testified that Angel was in the 70th percentile for weight, his height was excellent, and his milestones were very good. During that visit, Angel was congested with a slight fever and cough, and he was constipated. Developmentally, however, there was nothing wrong with Angel. Further, there were no signs of physical abuse noted in Angel's records. Later that day, appellant and Moreno moved into a home on Vermont Circle. Moreno testified that appellant was not there "all the time" because "he would go out." Moreno also testified that she began noticing bruises, marks, and cuts on Angel after they moved to Vermont Circle. She suspected that appellant was harming her son, and she told him to stop.

In his statement to police, appellant provided his own version of events. In addition to exculpating himself, appellant claimed that Moreno abused her children. He told police that her family was aware of how she treated her older children. He explained to police that while he played

roughly with Angel, he had nothing to do with Angel's head injuries. Appellant stated that after Moreno lay down for a nap, he was walking by the sofa where Angel was with Emily when he noticed that Angel was having trouble breathing. Appellant stated that he shook Angel and then placed Angel on the bed in the second bedroom before getting Moreno. Appellant admitted in his statement to police that he had bitten Angel because "[t]his is the way I play with [Angel]." In his statement, which was read to the jury and entered into evidence, appellant stated:

> I did bite the baby Angel Moreno on the cheek and on his buttocks about three days ago. I did this to the baby because I was playing with him. This is the way that I play with him. Sometimes I will pull or smash his nose with my hand. I will pick him up and put his forehead against mine.

Appellant explained that he played with Angel this way because Angel "cause[d] me to [be] anxious because he is white and I don't know." Appellant also admitted the following:

> [E]arlier today I was playing with the baby Angel Moreno by throwing him up in the air and catching him while I was lying on the bed. The baby did sustain bruises along his ribs while I played with him last week by throwing him up and catching him and squeezing him a little hard along his rib area. I was playing with him today and I shook the baby with force. I did this because I was trying to get him to laugh. He doesn't smile with me.

Moreno testified that on the day of the offense, Angel was normal and breathing well when she laid him down with Emily. Moreno described appellant as "nervous" when he came to tell her that something was wrong with Angel. She admitted on cross-examination that she never heard Angel crying. However, Dr. Norma Jean Farley, the forensic pathologist who performed the autopsy, testified that this would not have been unusual. Dr. Farley testified that a child very possibly would not cry when hit with enough force to cause Angel's injuries because such a blow "could put you out."

The neighbor testified that appellant did not seem worried, although her statement to police

indicated that appellant was nervous. She testified that appellant told her that a child was choking and he asked to use her phone. When she gave appellant her cordless phone, he told her that the phone did not work. On cross-examination, she admitted that she did not actually see if appellant attempted to dial 9-1-1. She testified that she dialed the number. At the time of trial, she did not recall telling police that appellant was nervous. When emergency personnel arrived at the scene, they noticed that appellant was "laid back," "indifferent," and stayed to himself, standing back.

During the autopsy of Angel's body, Dr. Farley conducted an initial visual examination of the child and found several injuries, including the following:

- a perfect circular scar on the bottom of his left foot that appeared to be a cigarette burn;

- a u-pattern burn on the posterior and lateral part of his left thigh that appeared to be from a disposable cigarette lighter;

- bruising from what appeared to be a bite mark on the posterior and lateral part of his left thigh;

- two more sets of bite marks on his torso; and

- a very large contusion with green discoloration that appeared older than the other injuries on his lateral left chest.

Dr. Farley testified that the burn scars and bite marks on Angel's thigh were old and could not be accurately dated. The bite marks on his torso were bruising only with no teeth marks. She testified that the contusion on Angel's torso was very deep and older than the other injuries. According to Dr. Farley, these injuries were signs of abuse. They were not, however, life threatening. She also testified regarding the injuries she found on Angel's head, including the following:

- contusions on his mid forehead and left scalp line;

- contusions with abrasions on his right frontal scalp and left parietal scalp, one of which was "crusted," indicating that it was older and healing;

- an abrasion at the top of his left ear; and

- two contusions as well as abrasions on the back of his head.

Once Dr. Farley opened the cranial vault, she discovered acute fresh subdural hemorrhaging primarily covering the left side and base of Angel's brain. She also found older subdural hemorrhaging in both parietal regions that corresponded to skull fractures extending across Angel's head. These injuries were caused by significant blunt force trauma, which Dr. Farley described as being a direct blow or multiple blows to the head. Dr. Farley explained that the injuries were due to "acceleration of the body or the head and then that instant impact when it hits something hard." She described it as like "slinging, you know, an infant up against a wall" or "slamming them by holding their feet."

Dr. Farley also found two additional "new" contusions. She described these contusions as "very significant head trauma," and indicated that she "usually [does not] see those [sorts of] contusions even on children who die." These injuries were of the sort that could stop the heart from beating, and according to Dr. Farley, they were not consistent with an accident. These contusions were not caused by the sort of blunt force trauma that occurs when a child falls from a sofa or while running.

When Moreno took Angel for a regular well-baby check, he was healthy and there were no signs of physical abuse noted in his medical records. Later that afternoon, Moreno moved households to a location away from the neighborhood in which her family lived. She and appellant were the only adults in the household, and appellant admitted to playing roughly with the child. Two

weeks later, Angel died as the result of significant head trauma after appellant discovered Angel not breathing.

Aside from the trauma responsible for Angel's death, Dr. Farley found evidence of non-life threatening physical abuse. Angel suffered from two skull fractures that were caused by direct blows to his head and were a week to two weeks old. Dr. Farley also found bite marks, evidence of cigarette and cigarette lighter burns, and very deep bruising on Angel's body. Angel's pediatrician testified that the injuries he witnessed in the emergency room on October 31st were not present on the 18th.

Viewing the evidence in the light most favorable to the verdict, we determine that the inferences necessary for a rational trier of fact to have found that appellant murdered Angel Moreno, a child under the age of six years old, are reasonable. Point of error seven is overruled.

## ACCOMPLICE CORROBORATION

In point of error three, appellant complains that the trial court erred when it failed to provide a jury instruction on accomplice corroboration regarding Acela Moreno's testimony as is required by Article 38.14.[2] Applicant argues that he was egregiously harmed by the lack of the statutory instruction.

An accomplice is one who participates in an offense, before, during, or after its commission, to the extent that she can be charged with the offense or with a lesser-included offense. *Blake v. State*, 971 S.W.2d 451, 454-55 (Tex. Crim. App. 1998). A prosecution witness who is indicted for the same offense with which the defendant is charged is an accomplice as a matter of law. *Ex parte*

---

[2] Article 38.14 states that: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

*Zepeda*, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991). If a prosecution witness is an accomplice as a matter of law, the trial court is under a duty to instruct the jury accordingly. *Blake*, 971 S.W.2d at 455. Failure to do so is error.

Here, appellant was indicted for the capital murder of a child under six years old. The record reflects that Moreno was also indicted for capital murder and that she was convicted of the lesser offense of injury to a child. Therefore, she was an accomplice as a matter of law, and the trial court should have instructed the jury to that effect. *Zepeda*, 819 S.W.2d at 876; *see also Blake*, 971 S.W.2d at 455.

We must next consider whether the trial court's error was harmful. Answering this question requires us to examine the effect an accomplice-witness instruction has on the trial. *See Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002). Article 38.14 provides that a conviction cannot be based on an accomplice's testimony unless that testimony is corroborated by other evidence that tends to connect the defendant to the offense. *Id*. The required instruction does not state that the jury should be skeptical of accomplice-witness testimony. *Id*. Nor does it instruct that the jury should give less weight to accomplice testimony than to other evidence. *Id*. Rather, the instruction informs the jury that it cannot use the accomplice-witness testimony unless there also exists some non-accomplice evidence connecting the defendant to the offense. *Id*. Once it is determined that such non-accomplice evidence exists, the instruction's purpose is fulfilled, and the instruction plays no further role in the jury's decision-making. *Id*. Therefore, non-accomplice evidence can render harmless a failure to submit an accomplice-witness instruction by fulfilling the purpose the instruction is meant to serve. *Id*. In determining the strength of a particular item of non-accomplice evidence, we examine (1) its reliability or believability, and (2) the strength of its tendency to

connect the defendant to the crime.  *Id*.

Under *Almanza*, the appropriate harm analysis depends upon whether the defendant preserved error by bringing the omission to the trial court's attention.  *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).  When the error is properly preserved, a reversal is required if "some harm" is shown.  *Id*.  However, when an appellant failed to preserve error, he must show egregious harm.  *Id*.  The difference in harm standards affects how strong the non-accomplice evidence must be before an erroneous omission of an accomplice-witness instruction will be considered harmless.  *Herron*, 86 S.W.3d at 632.

Appellant acknowledges that, while he requested an accomplice-witness instruction in a pretrial motion, he did not bring the written request or omission to the trial court's attention in open court, thus failing to properly preserve error.  Under the egregious-harm standard, the omission of an accomplice-witness instruction is generally harmless unless the corroborating non-accomplice evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive."  *Id*. (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)).

The non-accomplice evidence in this case consisted of the testimony of law enforcement officers, EMS personnel, appellant's neighbor, emergency-room physicians, forensic pathologists, and Angel's aunt, father, and pediatrician.  Appellant's statement is also included in the non-accomplice evidence.  The non-accomplice evidence established that, before appellant returned from Memphis, Angel's aunt and father saw no visible signs of abuse.  During Angel's last pediatrician visit, the doctor did not note  any unexplained injuries or signs of abuse in Angel's medical records.  Within the thirteen days following appellant's return from Memphis, Angel's body displayed

evidence of significant abuse. During that time period, Angel was living with only his mother, appellant, and three other children.

The autopsy also revealed that Angel had suffered significant abuse. Angel's pediatrician testified that the injuries he saw on Angel in the emergency room had not been present during Angel's last office visit. The pathologist who conducted the autopsy testified that these injuries were inflicted within two weeks of Angel's death. According to appellant's statement, he played roughly with Angel, causing the significant bruising on Angel's torso that was visible to the responding EMS personnel and emergency-room physicians. Appellant also admitted in his statement that Angel made him anxious. Appellant acknowledged that he was the one who discovered that Angel was not breathing. Further, appellant's behavior raised the suspicions of both his neighbor and the responding emergency personnel.

While the non-accomplice testimony in this case is circumstantial, it is not so unconvincing as to render the State's case clearly and significantly less persuasive. Appellant did not suffer egregious harm from the lack of an accomplice corroboration instruction. Point of error three is overruled.

In point of error eight, appellant alleges that the evidence of accomplice corroboration is insufficient to support his conviction. "The accomplice witness rule is satisfied if there is *some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment." *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997). The non-accomplice evidence need not itself be sufficient to establish the accused's guilt beyond a reasonable doubt. *Id.* While the accused's mere presence at the crime scene is insufficient, by itself, to corroborate accomplice-witness testimony, "evidence of such presence, coupled with other

suspicious circumstances, may tend to connect the accused to the offense." *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). Even "[a]pparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration." *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993). In order to determine whether the accomplice-witness testimony is corroborated, we eliminate all accomplice evidence from the record and determine whether the other inculpatory facts and circumstances in evidence tend to connect appellant to the offense. *Id*.

As set out previously, the non-accomplice evidence in this case establishes that Angel did not suffer any noticeable abuse before appellant's return from Memphis. However, Angel suffered significant injury in the two weeks following appellant's return. After the 9-1-1 call on October 31, law-enforcement officers and medical personnel identified several visible injuries, including bruising on Angel's forehead and torso, abrasions on his forehead, and bite marks on his ear, thigh, and torso. The autopsy revealed that Angel died from significant blunt-force trauma to his head. It also revealed additional injuries that were inflicted on Angel after appellant returned from Memphis. Appellant's own statement placed him in the home at the time of Angel's injuries and established that appellant had previously injured Angel. Although appellant denied directly causing the injury that led to Angel's death and placed the blame for Angel's injuries on Moreno, appellant admitted that he had left marks on the child's body during rough play. Appellant acknowledged that he played roughly with Angel by throwing him in the air and shaking him while trying to make him laugh. Appellant told police that Angel made him anxious. Further, appellant's demeanor following the incident raised suspicions with both his neighbor and emergency personnel.

After eliminating the accomplice testimony from the record, we determine that other facts

and circumstances in evidence tend to connect appellant to the offense. Point of error eight is overruled.

In point of error nine, appellant argues that the appropriate standard for evaluating the sufficiency of accomplice corroboration evidence should be the *Jackson* standard. This Court rejected the same argument in *Cathey v. State*, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999), and we find no reason to revisit the issue at this time. Point of error nine is overruled.

FUTURE DANGEROUSNESS

In point of error twenty-eight, appellant challenges the sufficiency of the evidence supporting the jury's future-dangerousness determination. Appellant specifically points to his lack of a serious violent criminal background and his good behavior while awaiting trial. Additionally, appellant argues that this crime was not particularly brutal and, therefore, the facts of the offense do not support a future-dangerousness finding.

A jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society. *Wardrip v. State*, 56 S.W.3d 588, 594 & n.7 (Tex. Crim. App. 2001); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). For example, the facts of the offense alone may be sufficient to sustain the jury's finding of future dangerousness. *Fuller v. State*, 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008); *Sonnier v. State*, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995). We must view all of the evidence in the light most favorable to the jury's finding and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the future-dangerousness issue was "yes." *Ladd v. State*, 3 S.W.3d 547, 557-58 (Tex. Crim. App. 1999).

The jury heard a variety of testimony during the punishment phase. In addition to the facts

surrounding the immediate injury that caused Angel's death, the jury had before it evidence of the abuse that he suffered in the weeks leading up to his death. That abuse included use of force sufficient to cause fracturing of Angel's skull.

The jury heard evidence relating to appellant's criminal history. Appellant had been previously convicted of battery and criminal mischief, both of which involved violent behavior. The jury heard testimony that appellant had attacked another person with either a baseball bat or an axe handle. Appellant had also been twice convicted of driving under the influence, as well as of felony forgery, evading arrest, and theft.

The jury also heard testimony that appellant did not successfully complete probation or parole. While on probation for forgery, appellant violated the conditions of his probation by failing to report to his probation officer for four months. His probation was revoked, and he was sentenced to two years' incarceration. He was later released to parole supervision, but he also violated the conditions of parole by committing the new offense of criminal mischief by causing between $200 and $750 worth of damage to an automobile. His parole was revoked, and he returned to prison to serve the remainder of his forgery sentence. Although appellant displayed no bad behavior while awaiting trial for this offense, jurors heard testimony that his good behavior could be attributed to appellant's desire to avoid the death penalty.

Appellant urges this Court to find that the crime in this case "was not particularly brutal relative to other capital murders" and thus, to find the evidence insufficient to support the jury's future-dangerousness determination. In reviewing a jury's future-dangerousness determination, we resolve each case on its own facts. *See Estrada v. State*, 313 S.W.3d 274, 284 (Tex. Crim. App. 2010) (citing *Dinkins v. State*, 894 S.W.2d 330, 357-61 (Tex. Crim. App. 1995)). On the record

before us, we cannot conclude that it would be irrational for a jury to find beyond a reasonable doubt that there is a probability that appellant would constitute a continuing threat to society. Point of error twenty-eight is overruled.

In point of error twenty-nine, appellant alleges that his sentence is "disproportionate, arbitrary and capricious, and no rational trier of fact could have imposed it." We understand appellant to argue that the evidence is legally insufficient to support the jury's answers to the future-dangerousness and mitigation special issues. We have decided in point of error twenty-eight that the evidence is legally sufficient to support the jury's future-dangerousness determination. We do not review the sufficiency of the evidence supporting the jury's response to the mitigation special issue. *See Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005). Point of error twenty-nine is overruled.

## MORENO'S TESTIMONY

In point of error one, appellant alleges that the "State corrupted the truth-seeking function of trial when it failed to correct the false and highly misleading testimony of its star witness [during] the guilt[/]innocence phase." Specifically, appellant complains that Moreno's testimony regarding her understanding of why she received a ten-year sentence misled the jury. Appellant argues that Moreno's testimony left the jury with the impression that she had no culpability in Angel's death.

A Cameron County grand jury indicted both appellant and Moreno for the capital murder of a child under six years old. The state offered Moreno a plea agreement under which Moreno plead guilty to injury of a child and received a ten-year sentence in exchange for her testimony against appellant. During appellant's trial, the prosecutor questioned Moreno about her sentence in the following exchange:

Q.      [Prosecutor]  Where are you living these days, Acela [Moreno]?

A.      Here at the jail.

Q.      And how long have you been in jail?

A.      It's going to be three years on October 31st.

Q.      And what is your understanding as to how many years you're going to serve?

A.      Ten years.

Q.      And what is your understanding as to why you're going to be serving 10 years?

A.      Because I am guilty of not having reported to the police that [appellant] was hurting my child.

Q.      Do you understand that you were charged with capital murder initially?

A.      Yes.

Q.      And do you understand that you've agreed to testify against [appellant] in this case?

A.      Yes.

On cross-examination, defense counsel again asked Moreno about her plea agreement and sentence.  Moreno acknowledged that, rather than facing the death penalty, she plead guilty to an offense that carried a maximum ten-year penalty.  Defense counsel did not object that Moreno's testimony on direct examination was either false or misleading.

During Moreno's plea hearing, her attorney made a statement on her behalf that "[s]he feels saddened by this incident.  She feels a loss of her child and she knows that she should have intervened on behalf of the child, did not, and wants to make sure justice is done as well as testify." Moreno pleaded guilty to injury to a child.  Texas Penal Code Section 22.04 states that a person commits injury to a child if she "intentionally, knowingly, recklessly, or with criminal negligence,

by act or intentionally, knowingly, or recklessly by omission, causes to a child . . . bodily injury."

A conviction obtained through the use of false testimony is a denial of the due process guaranteed by the Federal Constitution. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Ex parte Ghahremani*, 332 S.W.3d 470, 477 (Tex. Crim. App. 2011). Recently, in *Ex parte Chavez*, ___ S.W.3d___, No. AP-76,665, 2012 Tex. Crim. App. LEXIS 696 at *18 (Tex. Crim. App. May 23, 2012), we said,

> "The Due Process Cause of the Fourteenth Amendment can be violated when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly or unknowingly." *Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011) (citing U.S. CONST. amend. XIV). Testimony need not be perjured to constitute a due-process violation; rather, "it is sufficient that the testimony was 'false.'" *Id*. The question is whether the testimony, taken as a whole, gives the jury a false impression. *See Ghahremani*, 332 S.W.3d at 477; *Alcorta v. Texas*, 355 U.S. 28, 31 (1957).

*Id*. at *16.

Moreno's testimony that it was her understanding that she was serving a ten-year sentence because she failed to report appellant's abuse to police is arguably misleading.[3] Moreno was charged with capital murder, and she pleaded guilty to injury of a child. The discussion during her plea hearing centered around her failure to protect Angel. Additionally, the affidavits submitted by the state at that hearing support that Moreno did not physically abuse her child. However, Moreno pleaded guilty to injury to a child, which is a felony, rather than failure to report abuse, which is a

---

[3] Moreno's actions, or lack of action as the case may be, seem to fall within the "omission" portion of Penal Code § 22.04. Failure to report abuse, however, is a misdemeanor under the Family Code. *See* TEX. FAM. CODE § 261.109. Cases regarding the "omission" portion of Penal Code § 22.04 have generally centered around fact situations dealing with the failure to seek, or preventing another from seeking, medical attention for an elderly or disabled person or a child. *See, e.g., Villanueva v. State*, 227 S.W.3d 744 (Tex. Crim. App. 2007) (appellant prevented his girlfriend from taking her child to the hospital right after he apparently engaged in conduct that caused the child's injury).

misdemeanor. *See* TEX. FAM. CODE § 261.109. At the very least, Moreno's statement was misleading regarding the exact offense to which she pleaded guilty.

The use of misleading testimony violates due process when there is a "reasonable likelihood" that the misleading testimony affected the outcome of the trial, that is, it was material. When there is a "reasonable likelihood" that the material misleading testimony affected the outcome of the trial to the defendant's detriment, there is harm. In this case, the jury was aware that Moreno had initially been indicted for capital murder along with appellant. The jury was aware that in exchange for her testimony, Moreno pleaded guilty to a lesser offense for which she received the maximum sentence. Further, the jury heard Medrano's testimony that Moreno admitted biting Angel. The jury was also aware that, in his statement to police, appellant accused Moreno of causing Angel's injuries and of abusing her other children. In addition, the jury viewed the videotape recording of Moreno's interview with police during which she admitted to accidentally burning Angel with a cigarette.

On this record, we cannot find that there is a reasonable likelihood that Moreno's statement that she was serving ten years for failing to report appellant's abuse of Angel to police affected the outcome of the trial, i.e., it was not material. Because it was not material, it could not result in harm to appellant. Point of error one is overruled.

INCONSISTENT PROSECUTION THEORIES

In point of error twenty-seven, appellant complains that the state used "inherently factually contradictory theories" to convict appellant and Moreno. He argues that this violated judicial estoppel and his rights to due process and to be free from cruel and unusual punishment. The record reflects that appellant did not object at any time during his trial, which occurred after Moreno's plea hearing, about the State's use of inconsistent theories. Although error was not preserved, we address

it for purposes of clarification.

To violate due process, there must be an irreconcilable inconsistency at the core of the State's case. *See Hall v. State*, 283 S.W.3d 137, 156 (Tex. App.–Austin 2009, pet. ref'd) (citing *Smith v. Groose*, 205 F.3d 1045, 1050-52 (8th Cir. 2000)). To support his argument, appellant relies solely on *Groose*, a case which is not binding on this Court. Additionally, the facts in *Groose* are distinguishable from those in this case. In *Groose*, the court found that due process was violated when the state presented contradictory theories in co-defendants' separate murder trials. In one trial, the state claimed that the victims had been killed before the defendant began to participate in a burglary. *Id*. at 1050. In the other trial, the state claimed that the victims had been killed after the defendant began to participate in the burglary. *Id*.

In this case, appellant points to the capital-murder indictment against Moreno, which accused her of hitting Angel on the head or hitting his head against something. However, Moreno pleaded guilty to the indicted lesser offense, injury of a child. During the plea hearing, the parties discussed that Moreno failed to intervene on Angel's behalf, to protect him from appellant's abuse, and to act when she saw injuries that she attributed to appellant. Moreno failed to report appellant's actions to police or to protect her child from appellant's abuse. During appellant's trial, the state argued that appellant caused Angel's injuries, and Moreno testified that it was her understanding that she received a ten-year sentence because she failed to report appellant's abuse to police. Appellant argues that this inconsistency violates due process and judicial estoppel.

Appellant's due-process rights were not implicated here. While the state initially charged Moreno with capital murder, she was not convicted of inflicting the injuries that immediately led to Angel's death. Nor was she convicted under any theory that was inconsistent with the State's case

against appellant.

We similarly conclude that judicial estoppel is not implicated here. The doctrine of judicial estoppel prohibits a party who has taken a position in an earlier proceeding from subsequently taking a contrary position. *See Arroyo v. State*, 117 S.W.3d 795, 798 (Tex. Crim. App. 2003). Having concluded that no inconsistency existed between the State's theories at Moreno's and appellant's trials, we find that neither justice nor sound public policy require the application of judicial estoppel here. We likewise find that appellant's right to be free of cruel and unusual punishment is not implicated here. Point of error twenty-seven is overruled.

## SUPPRESSION HEARING FINDINGS

In point of error ten, appellant argues that the trial judge who entered the findings of fact and conclusions of law relating to appellant's suppression hearing lacked the authority to issue those findings because she was not the judge who presided over the suppression hearing. Appellant argues that this violates statutory law, is contrary to prior case law, and requires a *de novo* hearing to remedy the error.[4] The state responds that appellant waived this error because he did not present a timely written motion to the trial court. This Court previously addressed this issue during the pendency of this appeal.

The original trial judge conducted a hearing on appellant's motion to suppress his statements to police. During the suppression hearing, the trial judge stated on the record that, in making his ruling, he would take into consideration the credibility of the testifying witnesses. The trial judge

---

[4] *See* Art. 38.22 § 6; *Garcia v. State*, 15 S.W.3d 533, 536 (Tex. Crim. App. 2000) (rejecting findings and conclusions made by a trial judge who did not preside over the hearing because the judge who presided over the hearing was in a better position to evaluate witnesses' credibility and demeanor, and it was not appropriate for the second judge to make findings of fact based solely on the written transcript of the hearing).

announced his ruling from the bench, denying appellant's motion to suppress. Defense counsel orally moved for the preparation of findings of fact and conclusions of law. The record reflects that there was some confusion between the trial judge and defense counsel regarding whether an oral motion was sufficient or a written motion was necessary. The record does not reflect that a written motion was filed, and the trial judge did not enter written findings of fact and conclusions of law. In his motion for new trial, appellant complained that the trial judge did not prepare the findings and conclusions.

After the appellate record was received by this Court, appellate counsel filed a motion requesting that this Court abate the appeal and instruct the trial judge to enter written findings of fact and conclusions of law concerning the voluntariness of appellant's statements. This Court declined to abate the case, but ordered the trial court to prepare and file the required findings and conclusions. *See* TEX. R. APP. P. 34.5(c)(2); *Velez v. State*, No. AP-76,051 (Tex. Crim. App. Feb. 24, 2010)(not designated for publication). A supplemental record was not timely filed with this Court.

This Court subsequently received a letter from the trial judge explaining that she was not able to comply with our order because she was not the judge who presided over the suppression hearing. She advised that she had requested the presiding judge of the Fifth Administrative Region to appoint the judge who had presided over the suppression hearing to prepare findings and conclusions. Ultimately, the prior judge was not appointed, and on December 17, 2010, the new trial judge prepared findings and conclusions based on the record and the prior judge's ruling that the statement was voluntarily made, and the clerk forwarded a supplemental record to this Court. Once the trial court had fulfilled its duty under this Court's order and the record had been received by this Court, the trial court lost its authority to take any further action in this case. *See* TEX. R. APP. P. 25.2(g).

After the supplemental record was filed with this Court, appellant filed in the trial court an "Objection to Findings of Fact and Conclusions of Law and Motion to Hold *de novo* Hearing Pursuant to CCP 38.22." Pursuant to this motion, on January 19, 2011, the trial court rescinded its findings and conclusions and granted appellant a *de novo* suppression hearing. Two days later appellant filed in this Court a motion to stay the briefing schedule until the trial court completed the hearing and filed new findings and conclusions. However, because this Court had received the record in the case, the trial court had lost the authority to act on appellant's motion. Accordingly, we denied appellant's motion and accepted the December 17th findings and conclusions.

We now have before us a complete record, the parties' briefs, and the additional public information regarding the unavailability of the original trial judge. In his brief, appellant points out that under our holding in *Garcia v. State*, 15 S.W.3d 533, 536 (Tex. Crim. App. 2000), it appears that he is entitled to a *de novo* suppression hearing. In *Garcia*, however, we did not specifically address the rare situation that presents itself here, wherein the prior judge cannot be appointed to prepare findings of fact and conclusions of law because of unavailability or ineligibility.

Peculiar circumstances surround this case. While the record does not include the reason the presiding judge of the Fifth Administrative Region did not appoint the prior judge to prepare findings and conclusions, we take note of the readily available public information indicating that the prior judge is currently unavailable for appointment. In such a situation, where the prior judge is unavailable or ineligible for an appointment, we find it appropriate that there be an exception to the rule laid out in *Garcia*. In the event that the judge who presided over a suppression hearing is unavailable or ineligible to be appointed to prepare findings of fact and conclusions of law, the current trial judge may prepare findings and conclusions based on the prior judge's ruling on the

record and the transcript of the suppression hearing regarding whether a defendant's statement was voluntarily made.

We recognize that the original trial judge, who is uniquely situated to observe the demeanor of witnesses first-hand, is generally in the best position to assess the credibility of witnesses.[5] *See Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008). In this rare circumstance, the trial judge making the findings and conclusions did not observe the demeanor of the witnesses because she did not preside over the suppression hearing. However, she refrained from making any explicit credibility determinations. Thus, we will accept the new trial judge's findings and conclusions, and we will review the record to determine if they are supported by the evidence. Point of error ten is overruled.

## USE OF RESTRAINTS

In point of error nineteen, appellant contends that the trial court violated his constitutional rights by forcing him to appear at trial in visible shackles. In a pretrial motion, appellant sought to preclude being shackled in public, and at the beginning of voir dire, defense counsel pointed out, "Your Honor, my client has ankle bracelets on." Counsel asked the trial court, "Would the court consider suspending that?" The trial court responded, "No sir."[6]

The harm a defendant suffers when the jury sees him in handcuffs or shackles is that his constitutional presumption of innocence is infringed. *Long v. State*, 823 S.W.2d 259, 282 (Tex.

---

[5] We note that the original trial judge made implicit credibility determinations by denying appellant's motion to suppress his statement.

[6] The state argues that this issue is not properly preserved because this exchange between defense counsel and the trial court was not a proper objection. While this is not the form of a proper objection, this exchange did put the trial court on notice that appellant opposed being placed in leg restraints in front of the jury.

Crim. App. 1991). All efforts should be made to prevent the jury from seeing a defendant in shackles, except where there has been a showing of exceptional circumstances or a manifest need for such restraint. *Id*. On appeal, we determine whether the trial court abused its discretion by requiring appellant to appear in restraints. *Id*. To assist us in this determination, the record must clearly and affirmatively reflect the trial court's reasoning. *Id*.

In this case, the trial court did not make specific findings of fact justifying the use of leg restraints. There is no evidence in the record that appellant threatened violence or escape during his trial. The fact that a person is charged with the most serious of felonies cannot override his constitutional presumption of innocence. *Id*. at 283. On the basis of this record, we find that the trial court abused its discretion in shackling appellant during trial.

However, we decline appellant's invitation to find that shackling is inherently harmful and prejudicial. In this case, the record does not reflect that the trial court's abuse of discretion harmed or prejudiced appellant. While it appears that appellant was shackled throughout his trial, he fails to direct our attention to any place in the record showing that the jury actually saw the shackles. *See Cooks v. State*, 844 S.W.2d 697, 723 (Tex. Crim. App. 1992) (absent evidence that the jury actually saw the shackles, we will not conclude the defendant has been harmed). The only mention of the shackles in the record is the brief exchange between defense counsel and the trial court. Therefore, we cannot conclude, based on this record, that appellant was harmed in any respect by the use of the shackles. Point of error nineteen is overruled.

## DISQUALIFICATION AND RECUSAL OF SPECIAL PROSECUTOR

In point of error two, appellant alleges that the trial court's denial of his motion to disqualify the special prosecutor violated Article 2.01 and the Due Process Clause of the United States

Constitution. Appellant filed a pretrial motion seeking to recuse special prosecutor Luis Saenz on the basis of conflict of interest. Appellant alleged that he was a former client of Saenz because his family sought Saenz's representation in this case. Appellant complained that Saenz's representation of the state was in violation of the Texas Disciplinary Rules of Professional Conduct.

In support of his motion, appellant presented an affidavit from his sister Elmita Velez. Elmita stated that her sister Marisol Velez visited Saenz's office for the purpose of retaining counsel for appellant following his arrest in this case. Elmita took Marisol to Saenz's office, but did not attend the meeting. According to Elmita, Saenz advised Marisol that the state "did not have a case." Elmita also stated that Saenz informed Marisol that he sometimes "work[ed] in some cases as a district attorney." According to Elmita, Saenz told Marisol that he would check on the case and then call Elmita. Elmita and Saenz never spoke. Saenz never called Elmita, but Elmita attempted to contact him several times. Eventually, according to Elmita, Saenz's secretary told her that Saenz would not take the case "because he didn't have the time."

During the hearing on appellant's motion, Marisol was the only family member to testify. Rather than testifying on direct examination, Marisol submitted an affidavit and was then cross-examined by the state. In her affidavit, Marisol stated that she visited Saenz regarding her brother's case. She stated that she told Saenz that appellant was charged with murdering a child. According to Marisol, Saenz asked if she knew anything about the case. She told Saenz that her brother had just returned from working "up north," he was charged with the death of a baby, and the baby's mother was very irresponsible. Marisol stated that Saenz told her the state did not have a case, he had experience with this kind of case, and he served as a district attorney in some cases. Marisol also stated in her affidavit that she told Saenz that Elmita would call him because Elmita was in

"charge of hiring an attorney" for appellant.

On cross-examination, Marisol testified that she met with Saenz only one time, but she could not recall how long the meeting lasted. She testified that Saenz did not quote her a specific price. Additionally, she did not provide Saenz with any written materials to review, and she testified that she informed Saenz that the family's primary interest in looking for an attorney was cost. Marisol also testified that she told Saenz that she didn't know too much about the case – just that it was a "baby shake syndrome" case. Marisol admitted that when she spoke with Saenz, she was basing her information on "what the newspaper said." Marisol did not speak with Saenz again after that one meeting because, as she explained, she had done what she was charged to do. She testified that she was not charged with actually hiring an attorney; she was gathering information, and her sister was the person who would do the actual hiring.

Given these facts, we conclude that Marisol was not her brother's representative. *See* TEX. R. EVID. 503(a)(2)(A) (defining a "representative of the client" as "a person having authority to obtain professional legal services on behalf of the client"). Her sole responsibility was that of gathering information for her sister. Both she and Elmita acknowledged that Elmita was going to be the one to obtain representation. Additionally, Marisol admitted that the information she shared with Saenz was based on what the family had learned in the newspaper. *See* TEX. R. EVID. 503(a)(2)(B). Because Marisol could not have created an attorney-client relationship on her brother's behalf, and further, did not share any privileged or confidential information with Saenz, it was not a conflict of interest for Saenz to serve as the special prosecutor in appellant's case. The trial court did not abuse its discretion in denying appellant's motion to recuse the special prosecutor. Point of error two is overruled.

In point of error twenty, appellant alleges that the trial court erred when it failed to recuse the special prosecutor because of his bias. Appellant alleges that the special prosecutor was not "rigorously disinterested" as evidenced by his testimony during a pretrial hearing that he decided he did not want to defend appellant as soon as he learned that this was a case involving the death of a baby. Saenz explained that he had once "defended a case involving a baby . . . a death situation" and that he "never felt the same" afterward. Appellant argues that Saenz's personal bias disqualified him from being the special prosecutor in this case because it "create[d] an opportunity for conflict or other improper influence in professional judgment."

Appellant's motion to recuse Saenz alleged only conflict of interest. It did not allege that Saenz was biased. When Saenz testified during the pretrial hearing, appellant did not complain that Saenz demonstrated bias. Appellant did not bring the issue of bias to the trial court's attention at any time. Therefore, this issue has not been preserved for appellate review. *See* TEX. R. APP. P. 33.1. Point of error twenty is overruled.

## STATEMENT TO POLICE

In point of error eleven, appellant alleges that "because [he] could not and did not knowingly, voluntarily, and intelligently waive his *Miranda* rights, the trial court erred in admitting his statement." In point of error thirteen, appellant alleges that "the trial court violated [his] rights by admitting a statement that [he] could not possibly have read and adopted." Specifically, appellant argues that he could not have knowingly and intelligently waived the warnings given in English because he is illiterate in English and Spanish and "functions in the defective or mildly retarded level when tested in English."

The trial court is the "sole and exclusive trier of fact and judge of the credibility of the

witnesses" and of the evidence presented at a hearing on a motion to suppress. *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007), *quoting Green v. State*, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996). This is particularly true when the motion is based on the voluntariness of an appellant's statement. *Id*. Given this vital role, we afford great deference to the trial court's decision to admit or exclude such evidence and will overturn that decision on appeal only when a flagrant abuse of discretion is shown. *See Montanez v. State*, 195 S.W.3d 101, 106 (Tex. Crim. App. 2006).

Article 38.21 of the Texas Code of Criminal Procedure provides that the statements of an accused "may be used in evidence against him if it appears that the same w[ere] freely and voluntarily made without compulsion or persuasion." Our determination of whether a statement was voluntarily made is based on an examination of the totality of the circumstances surrounding its acquisition. *Wyatt v. State*, 23 S.W.3d 18, 23 (Tex. Crim. App. 2000); *see also Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991).

The trial court held a hearing on appellant's motion to suppress the statement he made to police. During the hearing, former Sheriff's Deputy Rene Gosser, who took appellant's statement, testified that he first spoke with appellant at the scene and later at the sheriff's office. The interview at the sheriff's office was conducted in a combination of English and Spanish. Gosser testified that he read appellant his rights and instructed appellant to initial each right and sign the waiver in English. According to Gosser, appellant knowingly complied.

Following an interview that lasted for about an hour, appellant agreed to give a statement. Gosser testified that he once again read appellant his rights in English and that appellant acknowledged in English that he understood. Gosser then questioned appellant in English while typing the statement into a computer. Gosser testified that, during the questioning, appellant

responded in English and that his responses were appropriate to the questions asked.

Gosser once again informed appellant of his rights after preparing the statement and gave appellant the printed statement to read. Gosser instructed appellant, in English, to read and sign the statement and initial each warning. According to Gosser, appellant appeared to read the statement before initialing each warning and each page of the statement and before signing the statement.

Dr. Michael Rabin, a forensic psychologist, also testified during the hearing. Dr. Rabin supervised appellant's testing by a Spanish-speaking psychologist who was completing his doctoral internship. Dr. Rabin also reviewed appellant's social history and competency-assessment results. Dr. Rabin testified that appellant's English reading ability measured below second grade, and his Spanish reading ability measured at a kindergarten level. According to Dr. Rabin, the statement produced by Gosser was written at a sophomore level and "[t]here is no way [appellant] could understand" the statement.

Dr. Rabin additionally testified that appellant has borderline intellectual functioning in Spanish and that his English skills are so poor that he tested in the "defective or retarded range." Based on testing conducted in English, Dr. Rabin reported that appellant had a verbal intelligence quotient (I.Q.) of 62, a performance I.Q. of 75, and a full scale score of 65. Dr. Rabin testified that, while appellant knew that he should have had an attorney, he did not understand the concept of consulting with an attorney before questioning. Appellant could not define the right to silence, but did understand self-incrimination when it was explained to him using different words. On cross-examination, Dr. Rabin acknowledged that appellant considered himself fluent in both English and Spanish. However, Dr. Rabin opined that, because of his level of functioning, appellant could not have competently, knowingly, and voluntarily waived his rights.

Finally, the state presented two witnesses who were incarcerated in the Cameron County Jail with appellant. David Bradshaw was jailed with appellant for approximately six months and shared the same "tank" for approximately three months. Bradshaw testified that he speaks both English and Spanish and that when he spoke to appellant in English, appellant responded appropriately. According to Bradshaw, appellant regularly read an English-language newspaper, and they would discuss the police-blotter section.

Brian Martin testified that he was jailed with appellant for three to four months. Martin speaks English exclusively and understands "a little" Spanish. Martin testified that he spoke English with appellant and saw appellant read an English-language newspaper. According to Martin, appellant would read and translate the horoscope section for non-English speaking inmates. Martin also testified that he wrote a letter for appellant in English, which appellant read back to Martin and then discussed with him. Martin testified that he wrote the letter so it would appear that "[appellant] didn't speak or understand English so that his confession could be dismissed."

The trial judge who presided over the suppression hearing denied appellant's motion to suppress the statement. The new trial judge who prepared findings and conclusions based on the prior trial judge's ruling and the transcript of the hearing found that "[appellant] was able to communicate in the English language and could read and understand English sufficiently to understand his statement and the waiver of his . . . rights."

Appellant argues on appeal only that, because he is illiterate in English and Spanish and possesses a low I.Q., he could not have voluntarily given his statement. A statement is not considered involuntary simply because a defendant suffers from some mental impairments. *See Delao*, 235 S.W.3d at 239-40, *citing Bizzarri v. State*, 492 S.W.2d 944, 946 (Tex. Crim. App. 1973).

An accused's mentality is but one factor among many to consider when evaluating the voluntariness of a statement. *Id.* The question is whether appellant's illiteracy was such that he was incapable of understanding the meaning and effect of the warnings.

At the pretrial hearing, appellant's expert testified regarding appellant's illiteracy and low assessment scores. However, according to other testimony, appellant was able to converse in English and gave appropriate responses in English when asked questions in English. Appellant's expert admitted that appellant considered himself "fluent" in both English and in Spanish. Further, other testimony showed that appellant was able to read an English-language newspaper and a letter written in English and hold discussions regarding what he read.

When tested by his expert, appellant defined the right to silence as "I'm not supposed to make a statement." He explained self-incrimination as "whatever I say they can use it against me in court." Appellant also understood that he was "supposed to have a lawyer," and he explained the "right to consult if indigent" as "if [you] don't got (sic) money, [the] court give (sic) you [a] lawyer."

In this case, not only did the trial court conclude that appellant's statement was voluntary, but the jury did as well.[7] Further, in making his ruling, the trial judge who presided over the suppression hearing necessarily made implicit credibility findings regarding the evidence and witness testimony presented during the hearing. Those findings, as well as the written findings and conclusions prepared by the new trial judge, are supported by the record. Therefore, based on the totality of the circumstances, we find that the trial court did not abuse its discretion in denying

---

[7] The trial court instructed the jury to completely disregard appellant's statement if it did not "find from the evidence beyond a reasonable doubt that before and during such statement, the defendant knowingly, intelligently[,] and voluntarily waived the rights hereinabove set out in the said warning." The jury's verdict could be understood to mean that either the jury determined that appellant's statement was voluntary or that the jury believed that the statement was involuntary but that other evidence was sufficient to establish appellant's guilt.

appellant's motion to suppress the statement he made to police. Points of error eleven and thirteen are overruled.

In point of error twelve, appellant argues that his constitutional rights were violated when the trial court admitted a two-page statement and a three-page statement, both of which were purportedly signed by appellant. Appellant complains that the trial court erred in leaving it to the jury to determine which statement he actually signed. Appellant urges that he was entitled to a determination by the trial court of which statement he actually signed.

During the suppression hearing, appellant apparently discovered for the first time that the three-page statement the state was attributing to him was different from the two-page statement defense counsel purportedly received from the state. *See* State's Exhibit 64 and Defense Exhibit 2. The difference between the two statements is an additional paragraph in the three-page statement in which appellant acknowledges throwing Angel in the air and shaking him.

The trial court examined both documents and observed that the signatures appeared different. The trial court asked appellant's expert witness which version of the statement he had reviewed, and the witness responded that he had been given the three-page statement by the defense. The trial court ordered the state to present witnesses on the issue. The state first called Gosser, who testified that the three-page statement was the statement taken from Velez. Gosser acknowledged that the two-page statement appeared to be a statement produced in the sheriff's department. Gosser identified his signature at the bottom of the two-page statement, and testified that the other signature appeared to be that of Lieutenant Carlos Garza. The trial court ordered that Garza appear before the court, and once Garza arrived in the courtroom, the trial judge went into chambers with Garza, Gosser, and the attorneys. The record does not reflect the result, if any, of the meeting in chambers.

At trial, when the state offered State's Exhibit 64 into evidence, appellant objected, arguing lack of predicate and that the statement was not voluntarily made. The trial court overruled that objection and admitted State's Exhibit 64, the three-page statement, into evidence. Later during trial, appellant requested that Defense Exhibit 2, the two-page statement, be admitted for all purposes. The state's objection was overruled, and the two-page statement was admitted.

Appellant's complaint on appeal, that his constitutional rights were violated by the trial court's admission of both statements and failure to make a determination regarding which statement appellant signed, does not comport with appellant's objections at trial. *See* TEX. R. APP. P. 33.1. Thus, appellant has failed to preserve this complaint for review. *See Guevara v. State*, 97 S.W.3d 579, 583 (Tex. Crim. App. 2003). Point of error twelve is overruled.

In point of error fourteen, appellant argues that his rights were violated when the trial court denied his request for the notes made during his interrogation by the officer who took his statement. Gosser testified that he generated the written statement that appellant signed based on the notes he took while interrogating appellant. Gosser testified that he was not in possession of the notes and that the notes remained at the Sheriff's office when he left his employment there. Gosser also testified that his notes were not included in the case file that he submitted to the district attorney's office. Appellant requested that these notes be produced. A short discussion ensued as to whether the notes would be considered work product. The state told the trial court that it did not have the notes, but it did have a report prepared by Gosser, which it presented to the defense. The record reflects that at the time that this occurred, the trial court did not actually make a ruling regarding the production of the notes. Therefore, this complaint has not been preserved for appeal. *See* TEX. R. APP. P. 33.1. Point of error fourteen is overruled.

PRIOR INCONSISTENT STATEMENT

In point of error seventeen, appellant alleges that the trial court erred by excluding extraneous evidence of a witness's prior inconsistent statement. Neighbor Veronica Aparicio testified that appellant told her that the phone she had given him to call 9-1-1 did not work when it actually did. During its cross-examination of Aparicio, the defense presented the written statement she gave to police. According to that statement, appellant was so nervous that he was not able to dial 9-1-1. Aparicio testified that she does not read or write English and that, while she signed the statement, she did not actually write it. The statement was prepared by a law-enforcement officer, but Aparicio could not remember which officer. At trial, after reviewing the written statement with the help of the court interpreter, Aparicio indicated that there were two discrepancies. She testified that she did not use the word "nervous" to describe appellant, and she indicated that the portion of the statement that said appellant knocked on her door was incorrect. She testified that appellant "came yelling" at her door rather than knocking.

Appellant moved to introduce Aparicio's written statement. The state objected on hearsay grounds, and appellant argued that the statement should be admitted for impeachment purposes. The trial court sustained the state's objection. Appellant argues on appeal that the statement should have been admitted as a prior inconsistent statement.

In considering a trial court's ruling on the admissibility of evidence, an appellate court must determine whether the trial court abused its discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). We uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000). Finally, we review the trial court's ruling in light of

what was before the trial court at the time the ruling was made. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

> Texas Rule of Evidence 613(a) provides that:
> In examining a witness concerning a prior inconsistent statement made by the witness, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of, such statement may be allowed, the witness must be told the contents of such statement and the time and place and the person to whom it was made, and must be afforded an opportunity to explain or deny such statement. If written, the writing need not be shown to the witness at that time, but on request the same shall be shown to opposing counsel, if the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted.

Subsection (c) of Rule 613 provides that "[a] prior statement of a witness which is consistent with the testimony of the witness is inadmissible except as provided in Rule 801(e)(1)(B)." Rule 801(e)(1)(B) accords substantive, non-hearsay status to prior consistent statements of a witness "offered to rebut an express or implied charge against [him] of recent fabrication or improper influence or motive."

Considering the facts and the arguments presented to the trial court, we cannot say that the trial court abused its discretion in excluding Aparacio's written statement to police. Two statements contained within the written statement were prior inconsistent statements, other statements were prior consistent statements, and other statements were arguably irrelevant or inadmissible hearsay. Hence, it was reasonable for the trial court to conclude that appellant was attempting to offer into evidence a document containing both admissible and inadmissible statements. When a trial judge is presented with a proffer of evidence containing both admissible and inadmissible statements and the proponent of the evidence fails to segregate and specifically offer the admissible statements, the trial court may properly exclude all of the statements. *Willover v. State*, 70 S.W.3d 841, 847 (Tex. Crim. App. 2002). We have previously explained that:

> Inadmissible hearsay testimony does not become admissible simply because it is contained within an admissible document or transcript. The trial court need never sort through challenged evidence in order to segregate the admissible from the excludable, nor is the trial court required to admit only the former part or exclude only the latter part. If evidence is offered and challenged which contains some of each, the trial court may safely admit it all or exclude it all . . . . When evidence which is partially admissible and partially inadmissible is excluded, a party may not complain upon appeal unless the admissible evidence was specifically offered.

*Id*. (quoting *Jones v. State*, 843 S.W.2d 487, 492-93 (Tex. Crim. App. 1992) (overruled on other grounds) (footnotes and some punctuation omitted)).

Because Aparicio denied only portions of her written statement to police, appellant could have introduced only those portions of her statement. *See McGary v. State*, 750 S.W.2d 782, 787 (Tex. Crim. App. 1988). He was not entitled to introduce the entirety of her statement. *Id*. at 788. It was appellant's responsibility to specify which portions of Aparicio's statement he wished to use for impeachment purposes. It was not an abuse of discretion for the trial court to exclude the entirety of the statement. Point of error seventeen is overruled.

## HEARSAY STATEMENTS

In point of error twenty-one, appellant alleges that the trial court erred in excluding hearsay offered as underlying support for an expert opinion. During the testimony of Dr. Michael Rabin, a defense expert, appellant sought to admit statements that his relatives and Moreno made during interviews with another defense expert, Dr. Kim Arredondo, who did not testify at trial. The trial court sustained the State's hearsay objection to the admission of the statements.

The problem posed here is that the statements at issue are hearsay. *See* TEX. R. EVID. 801(a)-(d). Such statements are inadmissible unless they fall under an exception. *See* TEX. R. EVID. 802. Appellant contends that these otherwise inadmissible statements should have been admitted as a

basis for his expert's opinion under Rule of Evidence 705. Texas Rule of Evidence 705(d) sets forth a balancing test for determining when otherwise inadmissible evidence can be admitted if it is relied upon by an expert in forming his opinion:

> When the underlying facts or data would be inadmissible in evidence, the court shall exclude the underlying facts or data if the danger that they will be used for a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial.

"One of the greatest dangers in allowing otherwise inadmissible evidence under Rule 705 is that the jury will consider the facts and data as substantive evidence rather than as merely constituting the underlying basis for the expert's opinion." *Valle v. State*, 109 S.W.3d 500, 505-06 (Tex. Crim. App. 2003) (quoting *Cole v. State*, 839 S.W.2d 798, 815 (Tex. Crim. App. 1992) (Maloney, J., concurring on reh'g)).

This Court is not able to discern from the record exactly what the content of the excluded statements would have been. However, given the context of the testimony at the time the statements were mentioned, the statements presumably concerned matters such as whether appellant was able to read or understand English, as well as his literacy level in Spanish and his education level. Dr. Rabin testified that it was his opinion that appellant could not have understood the statement he allegedly gave to police. Dr. Rabin further testified that he relied on the interviews Dr. Arredondo conducted with Moreno and appellant's relatives, as well as Dr. Arredondo's report and his own testing, to arrive at his conclusions. Allowing appellant to present his relatives' and Moreno's statements to the jury would have run the risk of the jury accepting their statements as substantive evidence. Further, given Dr. Rabin's testimony about the items he relied on to support his conclusions, appellant did not need to present the actual contents of the excluded statements. Under

the circumstances present here, the trial court did not abuse its discretion in declining to admit the evidence under Rule 705. Point of error twenty-one is overruled.

PHOTOGRAPHS

In point of error twenty-three, appellant alleges that the state committed prosecutorial misconduct by ignoring the trial court's ruling that excluded State's Exhibit 17, a photograph of the injury to Angel's ear. During the state's direct examination of Dr. Maria Camacho, appellant objected to the admission of this particular photograph, and the trial court sustained the objection. The prosecutor went on to ask Dr. Camacho to explain what was depicted in a series of photographs. It appears that the prosecutor presented the photographs to Dr. Camacho in numerical order; however, between the presentation of State's Exhibits 6 and 8, the record states that the prosecutor asked for a description of State's Exhibit 17. The record reflects that when Dr. Camacho briefly described the contents of the photograph, appellant did not object. The description that she gave, however, is that of State's Exhibit 7–not State's Exhibit 17. Thus, it appears from the record that the court reporter may have made a typographical error, typing "17" rather than "7." Even if it is not the case that the record contains a typographical error, the record reflects that State's Exhibit 17 was not submitted into evidence and was not viewed by the jury. Appellant has not shown that the state violated the trial court's ruling excluding State's Exhibit 17. Point of error twenty-three is overruled.

In point of error twenty-four, appellant argues that the trial court erroneously admitted evidence in violation of Rule 403 of the Texas Rules of Evidence. He specifically complains about an autopsy photograph (State's Exhibit 58) that was admitted over defense objection during the guilt phase. Appellant objected at trial that, because the forensic pathologist gave detailed testimony regarding the wounds Angel sustained and showed where those injuries occurred on a blackboard

diagram, the autopsy photograph should not have been admitted. Appellant also argues on appeal that the photo is irrelevant and had no probative value because the manner or cause of Angel's injuries or death was not contested.

Rule 403 requires that the evidence presented at trial have some probative value and that its probative value not be substantially outweighed by its inflammatory nature. TEX. R. EVID. 403; *Long*, 823 S.W.2d at 272. A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. The factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case. *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997); *Long*, 823 S.W.2d at 272. The admissibility of photographs over an objection is within the sound discretion of the trial court. *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. *Santellan*, 939 S.W.2d at 172.

State's Exhibit 58 is an autopsy photograph of Angel that was introduced during the testimony of forensic pathologist Dr. Norma Jean Farley. The photograph shows the damage done to Angel's head viewed from the underside of his scalp. Dr. Farley testified that the scalp was reflected in that photograph in order to show the bruising damage that could not be seen otherwise.

The autopsy photograph shows the condition of Angel's body and the wounds he received. The blackboard diagram showed the location of the bruising, but not the actual bruising itself. State's Exhibit 58 shows Angel's skull with the scalp reflected, which Dr. Farley explained was

necessary to clearly show the bruising damage to Angel's head. Because Dr. Farley needed the photograph to show an injury that was otherwise not visible, showing reflection of the scalp is not fatal to the admissibility of State's Exhibit 58. *See Harris v. State*, 661 S.W.2d 106, 108 (Tex. Crim. App. 1983) (explaining that because reflecting the skin from a victim's skull did not "obfuscate the results of the crime" but allowed the jury to see the injury, there was no error in admitting the photograph).

Considering all factors, we cannot conclude that the probative value of the photograph was substantially outweighed by its prejudicial effect or the needless presentation of cumulative evidence. The trial court did not abuse its discretion in admitting the photograph at trial. Point of error twenty-four is overruled.

CONFRONTATION

In point of error twenty-five, appellant alleges that he was "denied his right to confrontation, to due process, and to a fair trial" by the State's use of "non-confronted hearsay." Specifically, appellant complains that Dr. Zamir testified regarding medical-chart entries made by his nurse practitioner. The record reflects that appellant made no objections during Dr. Zamir's testimony. Therefore, this complaint has not been preserved for review. *See* TEX. R. APP. P. 33.1. Point of error twenty-five is overruled.

In point of error twenty-six, appellant complains that the trial court violated his "confrontation rights by admitting several testimonial hearsay statements by a witness who did not appear at trial." Specifically, appellant complains that Javier Reyna, a captain with the Cameron County Sheriff's Office, can be heard making several statements on the videotape recording of Moreno's police interview. Reyna did not testify during appellant's trial, and the videotape

recording of Moreno's interview was played for the jury. The record reflects that appellant did not object to the admission of the videotape recording of Moreno's interview on confrontation grounds. Therefore, this complaint is not preserved for review. *See* TEX. R. APP. P. 33.1. Point of error twenty-six is overruled.

## MANNER AND MEANS INSTRUCTION

In point of error eighteen, appellant alleges that the "trial court erred by charging the jury that it could convict upon an unknown manner and means of causing death, when the manner and means were not unknown." Appellant argues that, because the State's expert Dr. Vincent DiMaio testified that Angel's head was struck against a floor, wall, or furniture, "the trial court should have charged the jury that it could only convict upon sufficient proof of one or several of the options presented by the evidence." The jury was charged that it could convict appellant of capital murder upon finding that he intentionally or knowingly caused Angel's death by "striking the victim's head against a surface unknown to the grand jury, or by striking the victim's head with an object unknown to the grand jury."

Appellant relies exclusively on this Court's decision in *Sanchez v. State*, No. PD-0961-07, 2010 Tex. Crim. App. LEXIS 1242 (Tex. Crim. App. delivered Oct. 6, 2010) (*Sanchez I*). In *Sanchez I*, the Court drew a distinction between "unknown"–cannot be or has not yet been ascertained–and "unknowable"–has been ascertained, but cannot be comprehensively known– manner and means. The State's expert testified that the victim died of asphyxiation, but the cause of the asphyxiation was undetermined; it could have been caused by manual strangulation, ligature strangulation, blocking of the air passages, the use of a stun gun, or a combination of these methods. *Id*. at 16-17. This Court stated that, because all the evidence that could have been presented was

presented and there was still uncertainty as to which manner and means actually caused the victim's death, the manner and means were "unknowable"–"a known choice of several options as opposed to no evidence and no options." *Id*. at 18. We concluded that the jury charge was erroneous because the indictment contained an allegation of "manner and means to the grand jury unknown," when the manner and means were not truly unknown. *Id*. at 19.

However, in its opinion on rehearing, *Sanchez v. State*, No. PD-0961-07, 2012 Tex. Crim. App. LEXIS 692 (Tex. Crim. App. delivered May 16, 2012) (not yet reported) (*Sanchez II*), this Court held that

> [t]he Code of Criminal Procedure provides that the trial court must "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case." *See* TEX. CODE CRIM. PROC. art. 36.14. The Court's instructions must "apply the law to the facts adduced at trial." *Gray v. State*, 152 S.W.3d 125, 127-28 (Tex. Crim. App. 2004).
> . . .
> Neither the manner (the *actus reus*) nor the means (the "instrument of death") need to be agreed upon unanimously by a jury. [*Ngo v. State*, 175 S.W.3d 738, 742 n.27 (Tex. Crim. App. 2005)](noting that the jury must be unanimous on the gravamen of the offense of murder, which is causing the death of a person, but the jury need not be unanimous on the manner and means); *see also Jefferson,* 189 S.W.3d at 315; *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991). The jury need only unanimously agree that appellant caused the death of the complainant. *See Ngo*, 175 S.W.3d at 746.

*Id*. at *14-15.

In *Sanchez II*, this Court found the charge was erroneous because the "evidence in the record supports only a limited list of known alternatives for the manner and means of the cause of death," thus the "trial court's instructions should have reduced the four theories to the two theories with the specified manner and means that were supported by evidence at trial. *See Gray*, 152 S.W.3d at 127-28 (jury charge must apply law to 'fact adduced at trial')." *Id*. at *16. In contrast to the situation

in *Sanchez*, in this case the jury instructions conformed to the evidence that was presented at trial and failed to show with what surface or object the complainant's head had been struck.

Dr. DiMaio testified on direct examination that Angel's injury was "the type of injury you get when children are thrown like across the room into a wall, or if they're swung by their feet into furniture or something like that." He also testified on direct examination that Angel's injuries were fractures without scalp tears indicating that Angel's head impacted with a flat surface such as "a floor or a wall. Something like that." Finally, on cross-examination, Dr. DiMaio agreed with defense counsel's statement that "most likely the child was thrown or swung against the floor, a wall, or furniture." Dr. DiMaio did not definitively state that Angel's head was struck against a floor, wall, or furniture.

In this case, the expert testimony shows that Angel died from blunt trauma to the head. The blunt trauma was caused by Angel's head colliding forcefully with a hard, flat surface or object. The identity of that hard, flat surface or object–the means of Angel's death–is the unknown in this case. The state presented testimony that investigators were unable to ascertain which surface or object within the home that Angel's head was struck against. Investigators did not find forensic evidence tying any particular surface or object to Angel's injuries. Therefore, the surface or object truly is unknown, and it was not error for the jury to be so charged. Point of error eighteen is overruled.

CONDUCT ELEMENT INSTRUCTION

In point of error four, appellant alleges that the trial court's improper jury instruction denied him his rights to a fair and impartial trial and due process of law, in violation of state law and the Sixth and Fourteenth Amendments to the United States Constitution. Appellant specifically argues that the trial court's expansion of "the intent charge beyond the result of [appellant's] actions to the

'nature of conduct'" was reversible error.

> The definition portion of the court's charge provided, in relevant part, that:
> A person acts "intentionally," or "with intent," with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
>
> A person acts "knowingly," or "with knowledge," with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct and that the circumstances exist. A person acts knowingly, or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Appellant asserts that this charge "was thoroughly confusing as to whether the jury, in determining whether [he] 'did intentionally or knowingly cause the death of' Angel Moreno, could consider [appellant's] intent or knowledge with respect to the nature of his conduct and its surrounding circumstances, or whether it was limited to considering his intent or knowledge with respect to the result of his conduct."

Section 19.03(a) of the Texas Penal Code describes particular factual contexts that the Legislature has determined, in combination with an intentional murder, give rise to capital murder. In proving capital murder, the state must prove that the accused intentionally or knowingly caused the death of an individual and also that the accused engaged in other criminal conduct (*e.g.*, kidnapping, robbery, aggravated sexual assault, escape from a penal institution) or certain circumstances existed (*e.g.*, that the victim was a child under the age of six). Therefore, capital murder is a result-of-conduct offense, but it also includes circumstances surrounding the conduct and/or nature of conduct elements, depending on the facts that elevate the intentional murder to capital murder. *See, e.g., Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008); *see also Hughes v. State*, 897 S.W.2d 285, 296 (Tex. Crim. App. 1994). Accordingly, in a capital-murder

case that involves more than one conduct element, it would not be erroneous for the definitions to include more than the result of conduct element:

> [S]ince the State must prove every element of the capital murder and of the underlying offense, in *capital murder cases*, there is no error in failing to limit the court's charge to specific "result of conduct" language when the additional language concerning the culpable mental state is itself limited to proving the "conduct elements" for the underlying offense.

*Id.* at 295 (citations omitted) (emphasis in original). However, under our reasoning in *Cook v. State*, 884 S.W.2d 485 (Tex. Crim. App. 1994), it would be erroneous if, in a capital-murder case that involves only one or two of the three conduct elements, the definitions included all three of the conduct elements. *See Hughes*, 897 S.W.2d at 295.

In this case, the indictment charged that appellant intentionally or knowingly caused the death of Angel Moreno, a child under six years old, by striking Angel on or about his head with appellant's hands or feet, or striking Angel's head against an unknown surface, or by striking Angel's head with an unknown object. This offense includes just one of the three conduct elements. The state was required to prove that appellant intentionally or knowingly caused Angel's death (result of conduct), and that Angel was a child under the age of six years. *See* TEX. PENAL CODE ANN. § 19.03(a)(8); *see also Black v. State*, 26 S.W.3d 895, 897 (Tex. Crim. App. 2000) (holding that there is no requirement that an offender know or intend that his victim is less than six years old).[8] As mentioned above, the definition portion of the jury charge included the full statutory definitions of

---

[8] While the circumstance that elevated Angel's death from murder to capital murder was Angel's age, our case law holds that circumstance-of-conduct instructions apply only when the state must prove, as an element of the offense, that the defendant knew of the circumstance. The only such circumstance presently recognized is causing the death of a peace officer. *See Hughes*, 897 S.W.2d at 295 ("The State was required to prove that appellant intentionally or knowingly caused the death of the deceased (result of conduct) and that appellant knew the deceased was a peace officer (circumstances surrounding the conduct.)"). Clearly, appellant knew that Angel was under the age of six years, but current law does not require the perpetrator to know that the child is under six, thus a circumstances-of-conduct instruction should not be given.

intentionally and knowingly, including result-, nature- and circumstances-of-conduct language. Because this offense does not contain a nature-of-conduct element or a circumstance-of-conduct element, the trial court erred in failing to limit the definitions of culpable mental state to result of conduct. However, a mistake in the charge does not in and of itself require reversal. Because appellant failed to object to the instructions, our next inquiry is whether the record shows egregious harm to establish reversible error. *Almanza*, 686 S.W.2d at 171.

Egregious harm is a difficult standard to meet. *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011). The record must show "actual, not just theoretical, harm to the accused," and we must be able to conclude that appellant has been "deprived of a fair and impartial trial." *Id*. at 489-90. In assessing the harm resulting from the inclusion of improper conduct elements in the definitions of culpable mental states, we "may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge." *Hughes*, 897 S.W.2d at 297.

> The application portion of the charge in this case directed, as follows:

> Now if you find from the evidence beyond a reasonable doubt that on or about the 31st day of October, 2005 in Cameron County, Texas, [appellant] did intentionally or knowingly cause the death of [the victim] by striking [the victim] on or about the victim's head with [appellant's] hands or feet, or striking the victim's head against a surface unknown to the grand jury, or by striking [the] victim's head with an object unknown to the grand jury, and [the victim] was then and there an individual younger than six years of age, then you will find [appellant] "guilty" of Capital Murder, as charged in the indictment.

Although the definitions of "intentionally" and "knowingly" indiscriminately set forth the three alternative conduct elements, when those terms are viewed in their factual context, it is apparent which conduct element applies to which element of the offense. For example, the application

paragraph states that appellant "did intentionally and knowingly cause the death of [the victim.]" The terms "intentionally" and "knowingly" directly modify the phrase "cause the death." Referring back to the definitions of culpable mental states, it is obvious that the "result of conduct" and "cause the result" language are the applicable portions of the full code definitions.

We conclude that because the facts, as applied to the law in the application paragraph, pointed the jury to the appropriate portion of the definitions, no harm, much less egregious harm, resulted from the court's failure to limit the definitions of culpable mental states to the result of conduct. Point of error four is overruled.

## JURY ARGUMENT

In point of error twenty-two, appellant maintains that the prosecution deprived him of a fair trial through repeated misconduct during closing statements at the guilt phase. Appellant raises numerous complaints within one point of error. Our review of the record shows that appellant failed to object to many of the instances of alleged prosecutorial misconduct of which he now complains. Therefore, those specific complaints are not preserved for review, and we decline to address them. *See* TEX. R. APP. P. 33.1. We will address the remaining instances to which appellant did object. This Court has stated that proper jury argument generally falls within one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to an argument of opposing counsel; and (4) plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008).

Appellant complains that the prosecutor made the following argument to the jury: "Prior to his first birthday, [appellant], this coward right here, took —." Defense counsel objected, arguing to the trial court that this was an improper argument. The trial court properly sustained the objection.

Appellant's attorney did not ask the court to instruct the jury to disregard, but the trial court, sua sponte, ordered the comment "stricken from the record," which served essentially the same purpose of telling the jury not to consider the comment for any purpose. Under these circumstances, the trial court properly denied the motion for mistrial. *Lucero v. State*, 246 S.W.3d 86, 101 (Tex. Crim. App. 2008).

Appellant also complains that the state accused the defense of manufacturing evidence during its closing argument. Appellant did not object when the prosecutor argued to the jury that the two-page statement presented by the defense as appellant's true statement to police was a "document that somebody with a copy machine can come back and [with] just a little b[i]t of effort can go back and try to forge." However, later, appellant objected when the prosecutor further argued to the jury that "[the state did not bring] this statement here that shows an improper spacing on top [and d]oesn't show the third page conveniently the third – the last paragraph which is very incriminating again[st] [appellant]."

The trial court sustained appellant's objection that the prosecutor was arguing outside the record. Appellant did not request a curative instruction or move for a mistrial. The prosecutor immediately continued arguing to the jury that "[t]his statement is a fraud. Who brought it to you? Who introduced it? They brought it." At that time, defense counsel did not object, but did ask to approach the bench. A bench conference occurred off the record. When the parties were back on the record, the following exchange took place:

> [Defense Counsel]:     Judge, at this time I would request a Grand Jury investigation of me and let [the state] prove or try to prove their case against me.

> [Trial Court]:  All right.  I'll let them decide.

It was appellant's responsibility to request a curative instruction or move for mistrial. *See Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004) (indicating that, when a party fails to request a curative instruction and requests only a mistrial, the scope of review is limited to whether the trial court erred in not granting a mistrial).

Finally, appellant complains that the state improperly commented on his failure to testify. While discussing appellant's statement to police, which was given before his arrest and after he was advised of his rights, the prosecutor argued, "But what he admits to is only the biting and the squeezing of the ribs . . . The only thing [appellant] didn't want to talk about in his statement—." Defense counsel objected "to the comment on [appellant's] Fifth Amendment rights."

The trial court held a discussion outside the presence of the jury and confirmed with the court reporter that the prosecutor's actual words were "[t]he only thing that the defendant didn't want to talk about in his statement." The trial court ultimately overruled the objection, stating that the prosecutor's remarks did not rise to the level of commenting on appellant's failure to testify. Appellant requested a mistrial, which was denied.

The prosecutor's remarks referred specifically to appellant's statement, which was in evidence and had been taken before his arrest and after he had received warnings. Her remarks did not refer to appellant's decision not to testify at trial or any other post-arrest silence. Therefore, the prosecutor's arguments were not improper. Point of error twenty-two is overruled.

## JURY REQUEST

In point of error fifteen, appellant contends that the trial court erred in failing to provide the jury with an exhibit it requested during deliberation following the guilt phase. The jury requested to review several items, one of which was the video recording of Moreno's statement. The trial court

ruled that the jury could not have the entirety of the video recording but could request the specific portion it wanted to view. Defense counsel objected and argued that because the entire video recording was introduced into evidence, the jurors were entitled to see all of it.

Following a recess, the trial court corrected its ruling, indicating that defense counsel was correct. The trial court, the state, and defense counsel then discussed the best way to satisfy the jury's request. Difficulty arose because the video recording was entirely in Spanish. The trial court indicated that it would ask the jury whether it wanted to actually view the video recording of Moreno's statement in the court room or if the translated transcript of the video would be sufficient. The trial court told the jury: "This is what we are going to do, I want you to go back and think about what I said as a jury. [T]hen you send me a note on what you want to do, all right?" Prior to the jury informing the trial court of how it wanted to proceed regarding its request, the jury sent out a note indicating that it had reached a verdict.

While the trial court initially made an incorrect ruling, it corrected that ruling and was in the process of determining the best way to fulfill the jury's request when the jury reached its decision. Under these circumstances, we do not find that the trial court erred. Point of error fifteen is overruled.

RIGHT TO BE PRESENT

In point of error sixteen, appellant complains that his right to be present was violated when he was absent from the in-chambers discussion regarding appellant's two varying statements to police and from the proceeding regarding the jury's notes. The record reflects that appellant neither asked to be present in chambers nor objected to not being in chambers during the discussion regarding the two statements. Before the discussion regarding the jury notes, the state questioned

whether appellant should be present. The trial court noted that appellant "waived appearance," and defense counsel confirmed this, stating: "Your Honor . . . I do hereby waive his appearance at this time." Thus, this point of error has not been preserved for review. *See* TEX. R. APP. P. 33.1; *see also Routier v. State*, 112 S.W.3d 554, 575-77 (Tex. Crim. App. 2003). Point of error sixteen is overruled.

### A.P. MERILLAT'S TESTIMONY AT PUNISHMENT

In point of error five, appellant argues that the state violated appellant's constitutional rights by presenting "false and highly misleading testimony on a crucial issue." During the punishment phase, A.P. Merillat[9] testified that a capital murderer sentenced to life without parole could achieve a lower, less restrictive G classification status based on good behavior.

The prosecutor asked Merillat, "And in the event that a person is placed or sentenced to life in prison without parole, where do they serve that sentence?" Merillat responded,

> Interestingly enough, the classification system in prison determines where an inmate lives[,] if he is able to work, [and] how many privileges he has. The classification system determines how an inmate will spend the rest of his time[,] whatever it is[,] inside the penitentiary. It's the very heart of a prison inmate's sentence or his time in prison. When a person is convicted of capital murder and given a life sentence or anything less than death, he's classified immediately upon arrival [in the] prison system as what they call a G3. A G3 classification is a middle range classification, it's not the tightest they have, it's not the easiest they have. That G system begins at the number one, that means very light, like a trustee type status. Then it goes to number two, number three, number four, number five. Five being the worst inmates. A convicted capital murderer with a life sentence will go in automatically as a G3 right in the middle. In other words[,] that can be the same as a burglar or thief or a forger, or DWI felon. They could go in as a G3 too or they can be a G3 while in prison. You can promote up to better classification if you behave, you can go down to more strict classification.

Merillat was the only witness to testify regarding the Texas Department of Criminal Justice (TDCJ)

---

[9] The reporter's record incorrectly identifies this witness as A.P. Marilock.

classification system and about the environment a defendant might encounter if sentenced to life without parole, and while his testimony was more accurate than it had been in *Estrada*, 313 S.W.3d at 286-88, it remained false in at least one significant way.

In *Estrada*, Merillat testified that, "after 10 years of G-3 status, a capital murderer who had been sentenced to life without parole could earn a lower, less restrictive, G classification status than a G-3 status." *Id.* at 286. We sustained Estrada's point of error based on that false testimony. *Id.*[10] In this case, Merillat testified, "They could go in as a G3 too or they can be a G3 while in prison. You can promote up to better classification if you behave, you can go down to more strict classification." Such testimony is directly contradicted by a July 2005 TDCJ regulation, judicially noticed by the *Estrada* Court, that "unambiguously shows, 'Effective 9/1/05, offenders convicted of Capital Murder and sentenced to "life without parole" will not be classified to a custody less restrictive than G-3 throughout their incarceration . . .." *Id.* at 287.[11]

The United States Supreme Court has instructed that a death sentence based on materially inaccurate evidence violates the Eighth Amendment. *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988). At the time of trial, no inmate who was sentenced to life without parole would be assigned a G classification less than G-3. Both Merillat and the state knew or should have known of that regulation and therefore knew or should have known that Merillat's testimony about the G

---

[10]  During the punishment phase at Estrada's trial, the jury sent out two notes. The first inquired as to what the jurors should do if they could not "come to a decision" on future dangerousness. The second asked about the testimony of Larry Fitzgerald, a defense expert, and Merillat's testimony, both of whom had testified about the inmate classification system. Fitzgerald's (accurate) testimony that the least restrictive classification a capital murderer could ever get was G-3 was in conflict with Merillat's (inaccurate) testimony that a capital murderer's classification could become less restrictive after ten years in prison. (He seems to be referring to an outdated version of TDCJ regulations.) The response to both notes was "You have the law and the evidence. Please continue your deliberations."

[11]  The regulation was in effect in 2008 and is still in effect.

classification of inmates who were sentenced to life without parole was false. In *Estrada*, this Court found that such testimony is material. *Id*. at 287. We now consider harm.

Because the Supreme Court has held that a death sentence based on materially inaccurate evidence violates the Eighth Amendment, *Johnson*, 486 U.S. at 590, we examine the issue of harm pursuant to Tex. Rule App. Pro. 44.2(a), Constitutional error. Under that standard, a reviewing court "must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."

Merillat testified as an expert on prison violence and regulations: a Texas peace officer for 31 years; a criminal investigator for the special prosecution unit for 24 years; qualified as a fingerprint and "blood stain" expert; author of five books and numerous articles on prison violence in Texas; college lecturer on prison violence and classification of inmates; author of the curriculum for criminal investigations at Texas A&M University; and frequent speaker on prison violence, criminal investigations, and crime in Texas prisons. Such extensive credentials increased his credibility as a person knowledgeable about violence in prisons and future dangerousness.

After Merillat's testimony about classification, the prosecutor also led Merillat through a list of prison "horribles": escapes; smuggled cell phones; corrupt guards and wardens; inmates "raping and extorting" other inmates; 156 murders within the prison system since 1984; violent felony crimes committed by 94 convicted capital murders in the previous three to four years; five murders "this year," two in high security areas; two murders on death row and many attacks on guards; two capital murderers from Cameron County, the venue of this trial, who had been sentenced to life without parole instead of death and killed again in prison.

Merillat also stated that inmates sentenced to life without parole are treated just like all other,

non-death-row, inmates, but then contradicted himself and said that such inmates are not allowed out on work detail without an armed guard, but rules "change all the time." He conceded that, since the escapes of the Texas Seven, the authorities "don't want them working outside the fence, but it could happen." His testimony repeatedly emphasized the violence pervasive within the prison system: "a extremely violent place. Very violent"; "[t]he level of violence is extremely high inside Texas prisons"; it's a very, very violent, very dangerous place"; "Our prison system of Texas is a extremely violent place."

The state's case was circumstantial. The cause of death was clear, but the testimony about the manner and means of death showed that only two adults and several small children were in the home, an 11-month-old child died, and each adult pointed at the other as the perpetrator. The state presented no psychiatric evidence that appellant presents a future danger, nor did it attempt to rebut the defense's psychiatric evidence that appellant would not be a danger in the future.

At the time of his trial in 2008, Velez's criminal record consisted of a forgery (1985), criminal mischief (1988), a bar fight in Sauk County, Wisconsin, which resulted in three misdemeanor charges–battery, disorderly conduct, and use of a deadly weapon (1991), a DWI (1998), evading arrest or detention (2001), and three hot checks (2005). Other than the bar fight in 1991, all of the charges involved non-violent offenses. With the exception of the 1985 forgery, all were misdemeanors. He had also used more than one name, birth date, and Social Security number. Velez had been in custody for some period of time before trial and had a clean disciplinary record. And while the facts of a case alone may support a finding of future dangerousness,[12] after reviewing this record we cannot find beyond a reasonable doubt that Merillat's false testimony "did not

---

[12] *See, e.g., Estrada* at 312 and cases cited therein.

contribute to the conviction or punishment." Point of error five is sustained.

## OTHER PUNISHMENT PHASE ALLEGATIONS

In points of error thirty through thirty-five, appellant raises complaints alleging the improper admission of evidence during the punishment phase, the improper cross-examination of defense witnesses, prosecutorial misconduct during the punishment-phase closing arguments, and the improper granting of the State's challenges for cause.[13] Our resolution of these points of error cannot result in relief greater than that resulting from our resolution of point of error five. These are errors that are not likely to be repeated in a new sentencing hearing. Thus, we decline to address points of error thirty through thirty-five.

## TEXAS DEATH-PENALTY SCHEME

In point of error thirty-six, appellant alleges that the trial court erred in refusing "to instruct the jury that it had to find beyond a reasonable doubt the extraneous offenses offered by the State to prove the special issues." As appellant acknowledges, we have rejected this argument in other cases. *See Garcia v. State*, 57 S.W.3d 436, 442 (Tex. Crim. App. 2001). "As long as the punishment charge properly requires the State to prove the special issues, other than the mitigation issue, beyond a reasonable doubt, there is no unfairness in not having a burden of proof instruction concerning extraneous offenses." *Ladd v. State*, 3 S.W.3d 547, 574-75 (Tex. Crim. App. 1999). Point of error thirty-six is overruled.

In points of error thirty-seven through forty-two, appellant presents allegations that he characterizes as challenges to the jury instructions. These points of error, however, are actually

---

[13]  In capital cases, jury-selection claims that revolve around punishment issues are errors relating to punishment only. *Ransom v. State*, 920 S.W.2d 288, 297-98 (Tex. Crim. App. 1996).

facial constitutional challenges to Article 37.071.  The record reflects that appellant did not preserve these claims for appeal.  *See Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009).  Even if appellant had preserved these claims, they are without merit.

In point of error thirty-seven, appellant complains that the trial court committed reversible error in charging the jury that a "yes" vote to Special Issue Two, the mitigation special issue, required ten votes.  We have rejected this claim in other cases.  *See Rousseau v. State*, 855 S.W.2d 666, 687 n.26 (Tex. Crim. App. 1993).  Point of error thirty-seven is overruled.

In point of error thirty-eight, appellant argues that the trial court improperly charged jurors that they had the discretion to determine whether a circumstance was mitigating.  This Court has previously addressed and rejected this claim.  *See Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004).  Point of error thirty-eight is overruled.

In point of error thirty-nine, appellant alleges that the trial court erred by statutorily charging the jury on Special Issue One, the future-dangerousness special issue, because the term "probability" diluted the State's beyond-a-reasonable-doubt burden of proof standard.  This Court has rejected this claim in other cases.  *See Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003).  Point of error thirty-nine is overruled.

In point of error forty, appellant asserts that the trial court committed reversible error in charging the jury to presume that a death sentence was the appropriate penalty.  Appellant argues that the mitigation special issue in Article 37.071 unconstitutionally creates a "presumption of death."  We have addressed and rejected this claim in other cases.  *See Russeau v. State*, 291 S.W.3d 426, 436 (Tex. Crim. App. 2009).  Point of error forty is overruled.

In point of error forty-one, appellant asserts that the trial court's instructions applied an

unconstitutional statute by instructing the jury to consider mitigating evidence in its future-dangerousness determination. Appellant argues that the Article 37.071 instruction is unconstitutional because it directs the jury, while considering the future-dangerousness special issue, to consider "evidence of the defendant's background or character or the circumstances of the offense that militate for or mitigate against the imposition of the death penalty." We have previously addressed and rejected this argument. *See Estrada*, 313 S.W.3d at 306-07. Point of error forty-one is overruled.

In point of error forty-two, appellant alleges that the trial court erred by not instructing the jury that it could consider any residual doubt about his guilt as a mitigating circumstance. This Court has previously decided this issue adversely to appellant's position. *Gallo v. State*, 239 S.W.3d 757, 779 (Tex. Crim. App. 2007). Point of error forty-two is overruled.

In point of error forty-three, appellant complains that the indictment in this case is deficient because it did not contain grand jury findings on the future-dangerousness special issue. Citing to *Ring v. Arizona*, 536 U.S. 584 (2002), appellant argues that before the state could seek the death penalty in this case, the grand jury was required to pass on the future-dangerousness special issue. This Court has previously found that the state is not required to allege the special issues under Article 37.071 in the indictment and that the grand jury is not required to pass on the punishment special issues when deciding whether to indict a defendant for capital murder. *Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007). Point of error forty-three is overruled.

In point of error forty-four, appellant alleges that the statutory future-dangerousness special

issue violates the Eighth Amendment[14] because no one can reliably predict whether another person will commit acts of violence in the future and therefore this is an arbitrary factor. We recently addressed and rejected this claim in *Coble v. State*, 330 S.W.3d 253, 297-98 (Tex. Crim. App. 2010). Appellant's argument does not persuade us to revisit the issue. Point of error forty-four is overruled.

In point of error forty-five, appellant alleges that Texas prosecutors' "unfettered, standardless[,] and unreviewable discretion" to seek the death penalty violates equal protection, due process, and the Eighth Amendment of the United States Constitution. We have rejected these and similar claims in other cases. *See, e.g., Estrada*, 313 S.W.3d at 312. Point of error forty-five is overruled.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In point of error six, appellant raises numerous ineffective-assistance-of-counsel claims relating to the guilt and punishment phases of trial. Because of our disposition of point of error five, we find it unnecessary to address claims relating to the punishment phase. With respect to the guilt phase, appellant presents a lengthy list of counsels' alleged deficiencies. Appellant argues that counsel failed to do the following: correct Moreno's false testimony; request an accomplice-corroboration charge; object to the charge expanding intent beyond cause of death; and request a charge affording the benefit of doubt between the charged offense and lesser included offenses.

We determine that the record is not sufficient to address appellant's ineffective- assistance-of-counsel claims because it does not sufficiently show that counsel's representation was lacking in

---

[14] In the heading for this point of error, appellant contends that the statutory future-dangerousness special issue violates the Texas Constitution. However, within his argument, appellant cites the Texas Constitution only twice and does not provide any support for his Texas constitutional claim. Therefore, we decline to address this contention in relation to the Texas Constitution. *See Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991).

tactical and strategic decision making. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) ("Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision making as to overcome the presumption that counsel's conduct was reasonable and professional"). Point of error six is overruled.

## CUMULATIVE ERROR

In point of error forty-six, appellant argues that this Court should reverse the conviction and sentence because of the cumulative harm of the errors enumerated above. In light of our disposition of point of error five, our resolution of this point of error pertains only to the guilt phase of appellant's trial. On this record, we cannot say that the cumulative effect of any errors that may have occurred during the guilt phase rendered this portion of appellant's trial fundamentally unfair. *See Estrada*, 313 S.W.3d at 311 (citing *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004)). Point of error forty-six is overruled.

We affirm the appellant's conviction, set aside his death sentence, and remand the case to the trial court for a new punishment hearing.


Delivered: June 13, 2012
Do Not Publish